UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
SCAPA TAPES NORTH AMERICA, INC.      :
      Plaintiff-Counterdefendant     :
                                     :
v.                                   :      Civil No. 3:03cv1689(JBA)
                                     :
AVERY DENNISON CORP.,                :
      Defendant-Counterclaimant      :
```

RULING ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT [DOCS. ## 28, 31]

This commercial dispute arises from a written contract
between the parties that was intended to result in joint
development of a component of an automotive finishing product
that defendant Avery Dennison Corp. ("Avery") markets under the
brand name Avloy.  Plaintiff Scapa Tapes North America, Inc.
("Scapa") seeks a declaratory judgment that material it supplied
to Avery conformed to the contractual specifications, and related
injunctive relief (Count One), and damages for common law breach
of contract for nonpayment of goods (Count Two), improper
rejection of goods under the U.C.C. (Count Three), breach of the
covenant of good faith and fair dealing under Connecticut tort
law (Count Four), promissory estoppel (Count Five), and negligent
misrepresentation (Count Six).  See Complaint [Doc. #1].  Avery
has moved for summary judgment on all six of Scapa's claims.
Def. Mot. for Summary Judgment [Doc. # 28].  Avery also asserts
counterclaims against Scapa for a declaratory judgment that
Scapa's product did not conform to specifications (Counterclaim

1

One), damages for common law breach of contract (Counterclaim Two), and disgorgement of unjust enrichment (Counterclaim Three). Scapa has cross-moved for summary judgment on Counterclaims One and Two only.  See Pl. Mot. for Summary Judgment [Doc. # 31]. For the reasons that follow, Avery's motion will be granted as to Scapa's claims of breach of good faith, negligent misrepresentation, and promissory estoppel, as well as the issue of liability under the contract for 1-mil baseweb, and denied as to Scapa's remaining claims; Scapa's motion will be denied in its entirety.

## I.   FACTUAL BACKGROUND

Defendant Avery sells Avloy to automotive parts manufacturers.  Avloy is a type of film used to cover the outside of automobile parts as an alternative to wet spray paint.  Def. L.R. 56(a)1 Stmt. [Doc. # 35] at ¶ 2.  It comes in thicknesses of "1-mil" and "2-mil," and is shipped to customers in rolls. Id. ¶¶ 2-3.  Avloy consists of four layers: a baseweb, a color coat, a tie coat, and a backing sheet to protect the product in transport.  Id. ¶ 3.  Avery has in the past, and continues today, to purchase baseweb, the first layer, from outside vendors who manufacture it by "'solvent coating' the resin onto the substrate, which is a liquid process that uses a solvent, as the name implies."  Id. ¶ 5.

In 1998, Avery began searching for a way to make baseweb

2

through an extrusion technique, meaning squeezing melted resin onto the substrate.  Id. ¶ 6.  Bill Goldsmith, Vice President and General Manager of the Performance Films Division of Avery, stated that "[e]xtrusion technology had never been used before in the manufacture of Avloy®, but Avery believed that extruded baseweb would be cheaper and of better quality than solvent-coated baseweb.  Extrusion also has significant environmental benefits, since no solvents are used.  Avery employees secured several patents relating to the new process."  Goldsmith Aff. at ¶ 6.

In 1999, Avery began working with Great Lakes Technologies, which was bought by Scapa the next year, on developing extruded baseweb.  Id. ¶¶ 7-8.  Between late 1999 and 2001, the companies jointly conducted a series of test runs, and then proceeded to codify their future business arrangement in a written contract.

The Purchase and Supply Agreement, signed in April 2002, recites that Scapa has specialized manufacturing experience desirable to Avery; that Avery would provide Scapa with certain intellectual property relating to Avloy as set forth on separate riders; that Scapa would "need to make significant capital expenditures and allocate significant resources which would not be done absent the commitments of [Avery] set forth in this Agreement; and ... as a material inducement to [Scapa's] obligations ... [Avery] is willing to undertake" the exclusive

supply agreement set forth in the requirements contract provisions. Def. L.R. 56(a)2 Stmt., Ex. J at 1. The contract refers to the baseweb to be manufactured as "Avloy Product," and requires Scapa to "manufacture such Avloy Product for [Avery] in a good and workmanlike manner in accordance with specifications, quality standards and formulas" attached to the contract as a rider. Id. at 1-2. Exhibit A to the contract, entitled "Avery Dennison Proprietary and Confidential Specifications - Avloy," contains, among others, the following terms:

| Characteristic | UOM [unit of measurement] | MIN | MAX |
|---|---|---|---|
| Particles 0.4 mm$^2$ (within two linear feet x width of web) | | | 17 |
| Thickness | Mil | 1.7 | 2.1 |

Id. at 12.

The contract also reflects that the production of Avloy Product was still experimental at that point:

> *Initial Production Delays.* Customer [Avery] acknowledges and agrees that only samples of the Avloy product have heretofore been produced and that the manufacture of the Avloy product in the quantities contemplated will be subject to the installation and development of new equipment and process, the exact timetable for which cannot be determined at this time.
>
> Customer further acknowledges and agrees that there will be a period of time necessary for testing the new machinery and processes utilized in manufacturing the Avloy Product, that Supplier [Scapa] reserves the right to establish and extend testing procedures as Supplier deems reasonable under the circumstances prior to commencing full production, and that delays may result from this process. Accordingly, as a material inducement to Supplier's proceeding with this Agreement and making investment [sic] contemplated hereunder, Customer agrees that it waives the right to assert and will not assert any claim... for delays in delivery of Avloy Product ...

4

> unless and until Supplier acknowledges in writing that
> all tests [sic] production runs have been successfully
> completed ("Seller's Capacity Notice").  Customer agrees
> to cooperate with Supplier to test Avloy Product and to
> timely respond to Supplier inquiries respecting samples.
> ...

Id. at 7-8 (emphasis added).

The requirements contract was to last for a period of three years from the date that Scapa delivered the "Seller's Capacity Notice," renewable annually thereafter.  Id. at 2.  Avery was to provide Scapa with yearly forecasts of its requirements for baseweb, updated each month, id. at 5, and the contract permitted Avery to terminate the agreement for cause if, among other reasons, Scapa "fails to manufacture and deliver to [Avery] the Avloy Product as required by this Agreement, in sufficient quantities (subject to and based upon Customer's annual forecast) ... ."  Id. at 3.  The initial price of the baseweb was set at 35 cents per square foot, subject to annual adjustment by mutual consent.  Id. at 4.  Finally, the contract contains an integration clause, id. at 9, and a choice of law provision selecting Connecticut law.  Id. at 10.  It was signed by Avery General Manager Bill Goldsmith and Scapa Executive Vice President/General Manager Steve Lennon.

After the contract was executed, Scapa and Avery jointly engaged in trial production runs of baseweb in June, August and September 2002.  A December 20, 2002 internal Scapa memorandum, also relied on by Avery, see Avery L.R. 56(a)2 Stmt., ¶ 13,

states that the May run produced 6 rolls, of which 3 were sent to Avery, and "Feedback was good in fact only comment was 'ribbing.' Defect counts all below 10 defects and no mention of disagreement."  Def. L.R. 56(a)2 Stmt., Ex. O at 1.  The August run produced four rolls, of which "two rolls with defect counts of 12 and 14" were sold to Avery.  Id.  The notation regarding these rolls states, "Ribbing defect very light... ."  Id.  The September 2002 run resulted in 11 rolls after the testers "[s]tarted up and scrapped the 1st two rolls because of chill roll scratches. ... Defect counts are all under 17 and no mention at all of ribbing."  Id.  These runs appear to have generated no major quality control disputes between the parties.

    The last production run took place on November 12, 2002. This was the first run that Scapa conducted without assistance from Avery personnel, and it ultimately gave rise to this lawsuit.  Scapa produced 17 rolls of 2-mil baseweb, shipped them to Avery, and presented an invoice for approximately $107,600. Def. L.R. 56(a)2 Stmt., Ex. Q.  Avery rejected the shipment and refused to pay, on the ground that the material failed to conform to contractual specifications.  Avery's defect counts for the rolls ranged from 20 to 85 defects, including "ribbing/lines," and Avery therefore took the position that the rolls exceeded the 17-particle maximum.  Id. at Ex. S.  Scapa's particle counts ranged from 4 to 15, with no roll exceeding the 17-particle

maximum.  Id. at Ex. R.

The difference stemmed from varying measuring techniques.
Scapa measured only the contaminant particles that were embedded
in the baseweb.  Avery measured the particles plus the
surrounding area of deformation, which it called a "halo."  Giles
Dep. at 135.  Melissa Giles, who was then Avery's Coating Manager
for Coater 8, where baseweb is processed, stated that "any
disruption in the material would be included as part of the
defect. ...  That's a known, that's a given for any product we
run here, not specific to" the Avloy baseweb.  Id. at 136.

Giles also testified that she was not involved in
negotiating the terms of the contract between Scapa and Avery,
and when Goldsmith, who had negotiated on Avery's behalf, showed
her the agreed specifications, she was "surprised at the particle
count" of 17 because Avery's agreements with their existing
solvent-coated baseweb supplier called for a particle count of 3.
Id. at 33-34.  Goldsmith, however, stated that he consulted with
Howard Enlow, Avery's Technical Director, who was familiar with
their customers' technical requirements, and who approved a 17-
particle specification.  Second Goldsmith Aff. at ¶ 9.

Goldsmith testified that he did not expect the particle
specification to remain at 17 because his customers would not be
able to use material with that many defects and Avery would "get
a lot of it back ... ."  Goldsmith Dep. at 57.  Therefore Avery

intended to have Scapa manufacture enough baseweb meeting the contractual specifications "to get it tested" through Avery's quality control process, and "the full commercial product would need to be at some level of defect ... that was 3 or less." Id. Avery apparently did not share this understanding with Scapa, and several Scapa employees testified that they believed that Avery was "changing ... the goal post," Dep. of Scott Barnes at 25, in terms of the particle specifications.

An additional factor in the disagreement seems to be that some of the particles, which were clear, did not show up until the baseweb was laminated with colored coating. See Def. L.R. 56(a)1 Stmt., Exs. W, X.  Thus Scapa found it "shocking" to receive Avery's report, a few weeks after the November production run, that the rolls did not meet specifications once laminated, because the particles had not been evident to Scapa during their pre-lamination tests.  Email from Ron Lilly, id. at Ex. X.

After Avery refused to pay for the November 2002 rolls, the parties engaged in a series of communications, culminating in a letter of January 28, 2003 from Scapa to Avery, memorializing a phone conversation between the parties.  The letter sets forth an agreement that Avery was to pay half of the amounts of four disputed invoices from 2001-2002, and that Avery was to re-examine the November 2002 run to determine "how much is usable."

Id. at Ex. DD.

Avery ultimately concluded that all of the rolls were above the "17 defect limit" and not usable. Id. at Ex. GG. Scapa continued to disagree, but the parties attempted to continue their business relationship and conducted a trial run on March 24, 2003. Another trial was scheduled for April but, for reasons not apparent in the record, never took place. On May 28, 2003, Scapa wrote to Avery that it had decided not to produce any more extruded baseweb because the parties disagreed over the contractual specifications and Avery's "account was past due." Id. at Ex. II. Scapa filed this lawsuit on October 2, 2003.

## II. STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citing Adickes v.

9

S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  "The duty of the
court is to determine whether there are issues to be tried; in
making that determination, the court is to draw all factual
inferences in favor of the party against whom summary judgment is
sought, viewing the factual assertions in materials such as
affidavits, exhibits, and depositions in the light most favorable
to the party opposing the motion."  Id. (citations omitted).  "If
reasonable minds could differ as to the import of the evidence
... and if there is any evidence in the record from any source
from which a reasonable inference in the nonmoving party's favor
may be drawn, the moving party simply cannot obtain [] summary
judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d
Cir. 1997) (internal citations, alterations and quotations
omitted).

On cross-motions for summary judgment "neither side is
barred from asserting that there are issues of fact, sufficient
to prevent the entry of judgment, as a matter of law, against it.
When faced with cross-motions for summary judgment, a district
court is not required to grant judgment as a matter of law for
one side or the other."  Heublein, Inc. v. United States, 966
F.2d 1455, 1461 (2d Cir. 1993) (citing Schwabenbauer v. Bd. of
Educ. of Olean, 667 F.2d 305, 313 (2d Cir. 1981)).  "Rather, the
court must evaluate each party's motion on its own merits, taking
care in each instance to draw all reasonable inferences against

the party whose motion is under consideration."  Schwabembauer,
667 F.2d at 314.

**III.  PLAINTIFF SCAPA'S MOTION FOR SUMMARY JUDGMENT**

    **A.   Meaning of "Particle" In Supply Agreement**

    Scapa first moves for summary judgment on Count One of
Avery's counterclaim and Count One of its own complaint, both of
which seek a declaratory judgment on the proper definition of a
"particle" under the contract specifications and a determination
of whether the baseweb produced by Scapa's November 2002
production run conformed to the specification.

    "Where the language of the contract is unambiguous, and
reasonable persons could not differ as to its meaning, the
question of interpretation is one of law to be answered by the
court."  Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d
1274, 1277 (2d Cir. 1989) (quoting Rothenberg v. Lincoln Farm
Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985)).  "Contract
language is not ambiguous if it has a definite and precise
meaning, unattended by danger of misconception in the purport of
the [contract] itself, and concerning which there is no
reasonable basis for a difference of opinion."  Id. (internal
citation omitted).  However, even where language of a commercial
contract is unambiguous, testimony concerning trade custom and
usage may be offered to define terms that have a technical
meaning within a particular business.  Harry A. Finman & Son,

Inc. v. Conn. Truck & Trailer Serv. Co., 169 Conn. 407, 411, 363
A.2d 86, 89 (1975).  "Evidence of custom or usage is properly
admissible when the subject matter ... is not a matter of common
knowledge."  L.F. Pace & Sons, Inc., v. Travelers Indem. Co., 9
Conn. App. 30, 38, 514 A.2d 766, 771 (Conn. App. 1986).  In such
a situation, "[e]vidence of custom and usage in a trade is
admissible and the weight to be assigned it is for the jury."
Burlington Constr. Co. v. R.C. Equip. & Constr., Inc., 13 Conn.
App. 505, 508, 537 A.2d 534, 535 (Conn. App. 1988).

        Additionally, the "course of performance the parties
followed ... is strong evidence" of the parties' intent regarding
the meaning of their contract.  Putnam Park Assocs. v. Fahestock
& Co., 73 Conn. App. 1, 10, 807 A.2d 991, 997 (Conn. App. 2002)
(citing Restatement (Second) of Contracts § 202(4) ("where an
agreement involves repeated occasions for performance by either
party with knowledge of the nature of the performance and
opportunity for objection to it by the other, any course of
performance accepted or acquiesced in without objection is given
great weight in the interpretation of an agreement.")).

        In this case, the parties assert dramatically different
interpretations of the meaning of the word "particle" in the
contract specifications.  Scapa asserts that a particle is a
contaminant embedded in the baseweb and nothing else.  Avery,
however, asserts that under the trade usage applicable to this

contract and its contracts with other suppliers, it is understood
that a particle includes the entire defect, meaning the particle
and the so-called "halo" around it produced by the contaminant's
presence.  Scapa replies that if Avery wanted to specify a
description of "particle" in the contract that included a "halo,"
it could have done so in a manner similar to its contracts with
its customers and other suppliers, which have more detailed
specifications.  Avery's other contracts, however, do not contain
specifications for "particles" but describe resulting defects,
including "bumps," "craze lines," "dirt/lacquer gels,"
"fisheye/craters," "hairs," "lines," "micro-blisters," "pits"
"wrinkles," etc.  Scapa L.R. 56(a)2 Stmt. [Doc. # 36], Ex. G at
APF 2210, 2228, 2240, 2214, 2216.

A reasonable jury could conclude from this evidence that
"particle" was a technical shorthand for these various defects,
as asserted by Avery's employees, see Giles Dep. at 136 ("any
disruption in the material would be included as part of the
defect. ...  That's a known, that's a given for any product we
run here, not specific to" the Avloy baseweb).  Alternatively, a
jury could find, based on the more detailed specifications that
Avery included in its other contracts, that "particle" has no
specific trade meaning.  This issue cannot be resolved at the
summary judgment stage, except to conclude that "[e]vidence of
custom and usage in a trade is admissible and the weight to be

assigned it is for the jury." <u>Burlington Constr.</u>, 13 Conn. App. at 508, 537 A.2d at 535.

The weight that should be accorded the parties' past course of performance also must be decided at trial.  Avery has presented evidence from which a jury could conclude that the parties' course of dealing established an expectation that "particles" within the meaning of the contract were equivalent to "defects."  Avery has proffered somewhat tentative testimony about training Scapa personnel to measure defects according to Avery's standards early in the baseweb development process.  <u>See</u> Hack Dep., Def. L.R. 56(a)2 Stmt., Ex. H, at 46-47.[1]  It also could be inferred from Scapa's own internal memorandum of December 2002 that Scapa had an understanding that under the terms of the contract it was supposed to count "defects," including "ribbing."  Def. L.R. 56(a)2 Stmt. Ex. O at 1. ("Defect counts all below 10 defects and no mention of disagreement"

---

[1]Randal Hack, an Avery Quality Technician, testified, somewhat ambiguously, that he believes he trained Scapa personnel to measure particles using a "Tappi Chart," which has not been fully described in the summary judgment record:

> Q:   ... Did you ever train anyone at Scapa or talk to them about how to measure particles using the Tappi Chart?
> A.   I believe so, yes.
> Q.   And who did you talk to?
> A.   I would assume it would have been Bud Miner and [Duane] Gordon and maybe it was Meg [Gilmartin], I would assume that.  It's hard to remember that far back. ...
> Q.   And what did you talk about with them, I mean with respect to using the Tappi Chart?
> A.   You know, what I normally did is show them how to use it, you got to hold it and move it, and this is the size we're setting up on the defect.

Hack Dep. at 46-47.

concerning March 2002 run; August run produced "two rolls with defect counts of 12 and 14" with the "Ribbing defect very light;" September 2002 run said to have had "[d]efect counts ... all under 17 and no mention at all of ribbing.").  In March 2003, after the dispute over the contractual specifications arose, Ron Lilly of Scapa referred in an internal email to "the 17 defect limit."  Def. L.R. 56(a)1 Stmt., Ex. GG.

While Scapa makes much of the testimony of various Avery employees that the term "halo" was not used between the parties until after the dispute arose concerning payment for the November 2002 rolls, a jury could conclude that there had been no need for such a description during the parties' previous dealings because there was an understanding between them that the entire disrupted area constituted a "defect."  The summary judgment record does not contain sufficient evidence to discern how the "particle" counts on the earlier rolls were obtained, i.e., whether the parties measured the contaminant or the surrounding area as well. This issue of fact must be presented to a jury to decide whether the parties' course of performance, or trade usage in the industry, precludes Scapa from arguing that "particles" are something different from "defects."  Accordingly, Scapa's motion for summary judgment on its first count and Avery's first counterclaim is denied.

**B.   Breach of Contract**

Scapa also moves for summary judgment on Avery's Second Counterclaim, which alleges breach of contract, on the basis that Avery cannot prove any lost profits and therefore cannot prove it has suffered damages due to the contract's termination.  Avery concedes that its "lost profits are too speculative to permit recovery" because "[t]his is an entirely new business venture using entirely new technology that has never been attempted on a production scale."  Avery Brief in Opp. [Doc. # 38] at 6. However, Avery claims reliance damages for the Avloy Product previously paid for under the agreement plus sums expended "to keep the project going after Scapa initially threatened to terminate it."  Id. at 7.

Where expectation damages are too speculative to calculate, reliance damages may be awarded for breach of contract.  Int'l Brands USA, Inc. v. Old St. Andrews Ltd., 349 F. Supp. 2d 256 (D. Conn. 2004) (citing ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 669 (3d Cir. 1998) ("where a court cannot measure lost profits with certainty, contract law protects an injured party's reliance interest by seeking to achieve the position that it would have obtained had the contract never been made, usually through the recovery of expenditures actually made in performance or in anticipation of performance.")); Nashville Lodging Co. v. Resolution Trust Corp., 59 F.3d 236, 246 (D.C.

Cir. 1995) ("where the prospective, 'benefit of the bargain'
damages prove too difficult or speculative to calculate, courts
commonly give the plaintiff damages measured retrospectively,
protecting the plaintiff's 'reliance interest' by undoing the
harm which his reliance on the defendant's promise has caused him
and putting him in as good a position as he was in before the
promise was made.").

Scapa points out that Avery did not specifically claim
reliance damages for breach of contract in its pleadings.
Avery's second counterclaim specifically seeks lost profits and
not reliance damages.[2]  However, Avery also seeks "any and all
other and further relief that this Honorable Court deems just and
proper."  Am. Answer & Counterclaims [Doc. # 10], Prayer for
Relief.  Scapa does not assert that Avery is not in fact entitled
to reliance damages.  Furthermore, Scapa will not be prejudiced
by defendant's demand for reliance damages on the breach of
contract counterclaim because defendant also seeks reliance
damages--presumably in the same amount--in its unjust enrichment
counterclaim, on which Scapa has not moved for summary judgment.[3]

_____

[2]The counterclaim asserts:  "As a direct and proximate result of
[Scapa's] breach, Avery has lost considerable profits that it would have
realized with the production of extruded Avloy Product and has been damaged in
an amount to be determined at trial."  Am. Answer & Counterclaims [Doc. # 10]
at ¶ 38.

[3]Additionally, plaintiff's argument that the provision limiting the
parties' remedies to repair, replacement or refund, see Agreement at ¶ 7(b),
prohibits Avery from seeking reliance damages is without merit, as that
provision clearly applies in the case of defective goods, not breach of the
entire contract.

<u>See</u> <u>id.</u> at ¶¶ 40-42.

Therefore the Court will not grant summary judgment to Scapa on Avery's breach of contract counterclaim solely because Avery failed to articulate a specific claim for reliance damages on that claim.  Scapa's motion for summary judgment thus is denied in its entirety.

**IV.   DEFENDANT AVERY'S MOTION FOR SUMMARY JUDGMENT**

**A.    Counts Two and Three:  Breach of Contract**

Avery's motion for summary judgment essentially is a mirror image of Scapa's.  Avery begins by seeking summary judgment on Scapa's two breach of contract claims: Count Two of Scapa's complaint asserts a claim for "common law breach of contract for nonpayment of goods" based on Scapa's assertion that it supplied Avery with baseweb that conformed to specifications and Avery failed to pay for $107,608 of the goods, Compl. ¶ 29-30; and Count Three asserts a claim under the U.C.C. for improper rejection of the baseweb.  Avery advances six theories for why it is entitled to summary judgment on Scapa's breach of contract claims.

**1.    Accord and Satisfaction**

Avery moves for summary judgment first on the basis that the parties reached an accord and satisfaction[4] and therefore Scapa

---

[4]Avery alternatively asserts that there was a "novation," but this concept is inapplicable because the January 28 letter did not incorporate a new or different party to the contract.  <u>See</u> <u>Restatement (Second) of</u>

is precluded from suing on the contract.  Avery asserts that the
accord was memorialized in the January 28, 2003 letter from
Ronald C. Lilly, Vice President of Scapa Automotive, to Bill
Goldsmith, Vice President and General Manager of Avery's
Performance Films Division.  See Def. L.R. 56(a)1 Stmt., Ex. DD.
The letter summarized a telephone conference between the parties
concerning outstanding bills and future baseweb trials.
Regarding the bills, the letter stated that Scapa and Avery would
"split" four disputed charges from the runs between January 2001
and February 2002, and that Avery would pay in full the charge
for the "Mitsubishi film trial" (two rolls of 1-mil baseweb) from
November 2002.  Id.  Scapa was to issue a new invoice for all of
these charges in the amount of $35,274, and there is no dispute
that Avery paid that bill.

Regarding the disputed "November run" of 17 rolls of 2-mil
baseweb, however, the letter stated "Under review...Avery
evaluating to determine how much is usable."  Id.  Under the
heading "Actions," the letter stated, "Bill Goldsmith to complete
review of [November run] and Scapa/Avery resolve [sic] within 30
days."  Id.

The letter then set forth provisions for appointment of a
"joint development team" that was to "have full authority to

---

Contracts, § 280 (1981) ("A novation is a substituted contract that includes
as a party one who was neither the obligor nor the obligee of the original
duty.")

approve or reject all or part of a trial or production run at the time of manufacture." Id. Avery was to "provide the necessary quality training for key Scapa staff to recognize various issues and defects" in the baseweb, with a goal of a series of small production runs leading to larger runs when quality issues were resolved. Avery was to pay either $7500 toward the cost of each run, or the full value of the accepted baseweb, whichever was higher. Finally, "[a]t such time that regular production runs are resumed, Avery will take full responsibility for all goods that meet the product specifications." Id. Avery asserts that this letter was intended to replace the requirements contract and constitutes an accord and satisfaction.

"When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim." Herbert S. Newman & Partners, P.C. v. CFC Construc. Ltd. P'ship., 236 Conn. 750, 764, 674 A.2d 1313, 1321 (Conn. 1996) (quoting County Fire Door Corp. v. C.F. Wooding Co., 202 Conn. 277, 281, 520 A.2d 1028 (1987)). "An accord is a contract between creditor and debtor for the settlement of a claim by some performance other than that which is due." Id. (quoting W.H. McCune, Inc. v. Revzon, 151 Conn. 107, 109, 193 A.2d 601, 602 (1963)). To be considered valid, an accord, just as any other contract, requires "mutual assent"

20

between the parties.  Newman & Partners, 236 Conn. at 764, 674
A.2d at 1321; see also Restatement(Second) of Contracts (1981) §
281, app. note (d) ("The enforceability of an accord is governed
by the rules applicable to the enforceability of contracts in
general.").

In Newman & Partners, the plaintiff architectural firm
demanded from the defendant surety company payments the plaintiff
alleged were due for services in connection with the construction
of a new city hall building in New Haven.  The parties agreed
that the defendant would pay $200,000 to settle the dispute.  The
defendant tendered what it stated would be the first of three
payments, in the amount of $100,000, with a letter saying that
the next $50,000 would be paid at the end of that month and the
second $50,000 upon completion of the project.  The plaintiff
accepted the first check but wrote back to the defendant that
according to their understanding the last payment would be due in
about two months, not at the end of the project.  The parties
never came to an agreement on the timing, and the defendant never
paid the last $50,000.  Because "the parties had disputed the
terms of the settlement agreement," the Connecticut Supreme Court
held that there was no "mutual assent, or a 'meeting of the
minds,'" and therefore there was no valid accord.  Newman &
Partners, 236 Conn. at 764, 674 A.2d at 1321 (quoting Crucible
Steel Co. v. Premier Mfg. Co., 94 Conn. 652, 656, 110 A.2d 52

21

(Conn. 1920)).

Likewise, in this case the parties never reached an agreement regarding the disposition of the baseweb rolls produced during the November 2002 run.  The January 28, 2003 letter merely states that the issue is "Under review...Avery evaluating to determine how much is usable," and that "Scapa/Avery resolve [sic] within 30 days."  Def. L.R. 56(a)1 Stmt., Ex. DD.  The letter sets forth no definitive arrangement concerning the outcome of Avery's "review."  It does not bind Scapa to agree with Avery's final particle count and does not set forth any procedure in case of ongoing disagreement.  The language simply leaves open a future resolution of this issue between Scapa and Avery within 30 days.  As is evident from the present litigation, the parties never resolved this issue between themselves.[5] Without any mutual assent concerning payment--or nonpayment--for the 17 2-mil rolls from the November 2002 run, the parties' correspondence in January 2003 cannot form a valid accord on this issue.

---

[5]Fireman's Fund Ins. Co. v. Conn. Dept. of Public Works, No. CV 89354178S, 1996 WL 367795 (Conn. Super. June 4, 1996), relied on by Avery, is not to the contrary.  In that case, plaintiff indemnified the State on a project to build group homes, which was plagued by delays. The State fired the general contractor, after which time plaintiff assumed responsibility for only a part of the project--four homes out of eight--on a modified time schedule. The court held that the modified agreement was an accord and satisfaction, finding a "meeting of the minds" because "[a]ll of the concerns of the parties were included in the March 3 Agreement and were resolved by them in that contract."  Id. at *14.  In the present case, the letter from Scapa to Avery does not resolve all of the concerns of the parties and therefore does not manifest an "inten[t] that it should release both [parties] from all obligations" under the original contract.  Id.

Additionally, there is a dispute of fact regarding whether the letter's provisions concerning developmental trials of baseweb were intended to replace the 2002 requirements contract in its entirety.  Avery takes the position that the letter is a substituted contract, while Scapa argues that it was not.  The letter itself concerns interim steps the parties contemplated to get the Avloy baseweb project back on track; it does not contain any provisions concerning the parties' future business relationship once successful production runs had been completed.  As such, the letter is not inconsistent with the continued existence of the original requirements contract.  The existence of a substituted contract depends on the intent of the parties, Latham & Assocs. v. William Raveis Real Estate, Inc., 218 Conn. 297, 305, 589 A.2d 337, 341 n. 6 (Conn. 1991) (citation omitted), which is not evident from the face of the two documents at issue here.  Thus the Court cannot conclude as a matter of law that the parties manifested an intent to substitute the January 28 letter for the 2002 requirements contract, and Avery's motion for summary judgment on this basis must be denied.

### 2.   Termination of Requirements Contract

Avery argues, in the alternative, that it is entitled to summary judgment on Scapa's breach of contract claim because Scapa, not Avery, terminated the requirements contract.  Scapa counters that Avery terminated the contract by its refusal to

accept baseweb that Scapa believed conformed to the contractual specifications.

After the January 28 letter, the parties conducted another trial run on March 24, 2003.  Representatives of both companies attended.  Scapa produced four rolls, of which Avery accepted three.  Def. L.R. 56(a)1 Stmt., Ex. HH.

The parties planned to conduct another trial in April, but that never occurred.  On May 28, 2003, Scapa wrote to Avery that it had decided not to make any subsequent shipment "to avoid further complicating the issue."  Id. at Ex. II.  Scapa alleged that Avery's "account was past due," and "Avery had not responded to Scapa's repeated requests for confirmation that the product specifications, as reformulated product (which was manufactured in March 2003 at a trial under Avery supervision) was acceptable. Scapa did not want to again manufacture product only to be told that it was not workable by Avery."  Id.  Thus Scapa's argument returns to the issue of whether Avery's interpretation of the term "particle" in the contract was accurate, which the Court already has found requires disposition by a jury.

Avery argues, however, that even if its rejection of the November 2002 was improper, Scapa was not entitled to terminate the contract for this nonpayment.  Avery reasons that the requirements contract was an installment contract, which can only be terminated if failure to pay for one installment substantially

24

impairs the value of the entire contract.  <u>See</u> Conn. Gen. Stat. §
42a-2-612(3) ("Whenever nonconformity or default with respect to
one or more installments substantially impairs the value of the
whole contract there is a breach of the whole.").  Assuming for
present purposes that the parties' agreement fits the definition
of an installment contract, Scapa's refusal to produce additional
runs was based not only on Avery's failure to pay for the
November run, but also on Avery's interpretation of the particle
specification, which would apply to all future runs.  In other
words, Scapa's position is that Avery engaged in anticipatory
repudiation of the contract by stating that it would not accept
baseweb with particles that Scapa believed were too small to be
counted under the original specification.  <u>See</u> Conn. Gen. Stat. §
42a-2-610 (anticipatory repudiation occurs "[w]hen either party
repudiates the contract with respect to a performance not yet due
the loss of which will substantially impair the value of the
contract to the other...").  Whether Avery in fact repudiated the
contract by changing the demanded specifications, or correctly
interpreted the specifications in the existing contract, again is
a question for a jury.

     If a jury finds anticipatory repudiation, then Scapa had
three options under Connecticut's version of the Uniform
Commercial Code: "(a) for a commercially reasonable time await
performance by the repudiating party; or (b) resort to any remedy

for breach ... and (c) in either case suspend [its] own performance ..." Id. Thus Avery's argument that Scapa necessarily waived the right to enforce the contract by failing to terminate it for five months is unavailing. Avery cites no authority for the proposition that five months, between January and May 2003, is not a "commercially reasonable time" to "await performance" after an anticipatory repudiation, especially where, as here, the parties attempted to continue their relationship, engaged in another production run, and eventually found their differences of opinion to be irreconcilable.

Therefore the Court finds that there is a material dispute of fact concerning whether Scapa terminated the contract by its May 28 letter or whether Avery terminated it by anticipatory repudiation. As such, Avery is not entitled to summary judgment on Scapa's breach of contract count on the asserted grounds that Scapa improperly terminated the contract.

### 3.   Requirements Provisions

Avery also moves for summary judgment on Scapa's breach of contract count on the additional basis that Avery has complied with the contract because it has not purchased extruded baseweb from any other supplier. Scapa argues in opposition that the contract required Avery to purchase all of its requirements of baseweb, not just extruded baseweb, from Scapa. The applicable contract language states:

26

>During the term of this Agreement, Customer [Avery] shall purchase from Supplier [Scapa], and Supplier shall supply to Customer, one hundred percent (100%) of Customer's requirements of Avloy Product needed by Customer for production of its Avloy® product (the "Minimum Purchase Requirement").  Notwithstanding the above, in the event Supplier is unable to supply Customer with one hundred percent (100%) of its requirements of Avloy Product for use in Customer's Avloy® product, whether for reasons of force majeure or otherwise, Customer shall be entitled to enter into an agreement with such third party for the production of Avloy Product until such time as Customer determines, in its sole discretion, that Supplier is able to fulfill its obligations under this Section... .

Agreement ¶ 5(c), Pl. L.R. 56(a)1 Stmt., Ex. G.  Thus the plain language of the requirements provision applies to baseweb "needed by Customer for production of its Avloy® product," id., without distinguishing between extruded and solvent coated baseweb.

The undisputed facts show that both parties entered the contract negotiations believing that extruded baseweb eventually would be less costly to produce than solvent coated baseweb, and therefore they contemplated that Avery would phase out its solvent coated supplies and buy all its requirements of baseweb from Scapa, its exclusive supplier of extruded baseweb.  To hold that the agreement permits Avery to purchase its requirements of baseweb from its solvent-coated baseweb supplier, regardless of Scapa's ability to supply extruded baseweb, would read into the contract a provision in direct conflict with the intent of both parties when they began negotiations.  The "Initial Production Delays" section of the contract, id. at ¶ 7(c), indicates that the parties contemplated that a startup period would be necessary

before extruded baseweb would become a fully viable technology, during which time Avery was entitled to purchase baseweb from other suppliers under the exception for Scapa's inability to supply 100% of Avery's needs, id. at ¶ 5(c).  Once Scapa issued a "Seller's Capacity Notice," however, the requirements provision would become effective and Avery would be obligated to purchase its entire baseweb supply from Scapa (or if Scapa could not meet Avery's entire need, as much baseweb as Scapa could produce).  In other words, both parties bargained with the intent that Avery would have at least some requirements for extruded baseweb in the future.  It is unreasonable to interpret the contract to allow Avery to unilaterally decide, after Scapa had the ability to produce conforming baseweb, to purchase solvent-coated baseweb from another supplier and no extruded baseweb from Scapa.

Avery argues, nonetheless, that the contract's definition of "Avloy Product," contained in the second recital clause, indicates the parties' intent that only extruded baseweb be included in the bargain:

> WHEREAS, Customer has provided and/or will provide Supplier with intellectual property relating to the production of a PVDF acrylic film product that is a component of a paint film marketed by Customer under the name Avloy® (such intellectual property, including the specifications and formulas set forth on Exhibits A and C attached hereto, and the Patents and pending application set forth on Exhibit B attached hereto, being hereinafter referred to as the "Avloy Intellectual Property," and such component being hereinafter referred to as the "Avloy Product")...

28

Avery reasons that the above definition of Avloy Product includes only extruded baseweb because the attached exhibits pertain only to extrusion technology.  Avery misreads this paragraph, however. Exhibits A-C to the contract comprise "Avloy Intellectual Property," which is distinct from "Avloy Product."  The intellectual property is said to "relat[e] to the production of" baseweb, but it does not limit the baseweb that is the subject of the contract only to extruded baseweb covered by the appended patents and specifications.[6]  It is not reasonable to interpret this paragraph as limiting the requirements provision only to extruded baseweb.  Avery therefore is not entitled to summary judgment on the basis that it has not purchased extruded baseweb from any supplier other than Scapa.

### 4.   1-Mil Baseweb

Avery additionally moves for summary judgment on Scapa's breach of contract claim to the extent that Scapa claims as damages lost profits from manufacture of 1-mil baseweb.  Avery asserts that the contract specifications for Exhibit A call for a

---

[6]The patents listed on Exhibit B are identified by number only, with no explanation.  Defendant cites the deposition of John Markey, see Def. L.R. 56(a)1 Stmt., Ex. D., at 27, for the proposition that the patents listed on that exhibit pertain to extruded baseweb.  Mr. Markey testified that he obtained two patents related to extruded baseweb, but he did not state whether his patents were listed on Exhibit B.  The chemical compounds listed as the "Avloy Formula" on Exhibit C are likewise unexplained in the record, although one combination is designated an "extrusion coating blend."  Therefore the record is insufficient for the Court to determine at this stage whether these exhibits pertain to extrusion technology.  Even if Avery is correct regarding the exhibits, however, the exhibits still only define "Avloy Intellectual Property," not "Avloy Product."

thickness of 1.7 to 2.1 mil, and therefore 1-mil baseweb never would have been acceptable under the specifications.  Avery further argues that the price stated in the contract, 35 cents per square foot, is what Avery paid for 2-mil baseweb, while it paid only 27 cents for 1-mil baseweb, and therefore the contract could not apply to 1-mil baseweb.  See Agreement at ¶ 4(a).

Avery did in fact order two rolls of 1-mil baseweb from Scapa, at a price of 27 cents, as part of the November 2002 production run.  Avery accepted and paid for those rolls.  See Invoice, Def. L.R. 56(a)1 Stmt., Ex. N.

Scapa argues that the contract permits the specifications in Exhibit A to "be amended by mutual consent of Customer and Supplier from time to time," Agreement at ¶ 2, and that Avery's order of two rolls of 1-mil baseweb constitute such an amendment.  However, a single order does not amount to a course of dealing that could amend the contract for future purposes, absent evidence of both parties' intent to amend.  Rather, Avery is correct that the contract specifications call for 2-mil baseweb only.  Therefore Avery is entitled to judgment as a matter of law on Scapa's claim for lost profits from 1-mil baseweb.

### 5.  Lost Profits

As the fifth ground for summary judgment on Scapa's breach of contract claim, Avery asserts that Scapa's alleged lost profits are "hopelessly speculative, if, indeed, they exist at

all." Avery Brief [Doc. # 34] at 12.  A new enterprise may
recover lost profit damages that it can prove "to a reasonable
certainty." Beverly Hills Concepts, Inc., v. Schatz & Schatz,
Ribicoff & Kotkin, 247 Conn. 48, 68, 717 A.2d 724, 735 (Conn.
1998).  The plaintiff's burden is to "present sufficiently
accurate and complete evidence for the trier of fact to be able
to estimate [lost] profits with reasonable certainty." Id. at
70.  The Connecticut Supreme Court has "note[d] that lack of
prior profitability does not necessarily prohibit a trial court
from awarding future lost profits, although it serves as a strong
indicator that future profits are uncertain. The plaintiff must
carry the burden of proving that prior losses will be turned
around to provide future gains." Id. at 75-76.

    Avery's arguments focus primarily on Scapa's use of
allegedly outdated forecasts of Avery's baseweb requirements, the
uncertainty of Scapa's costs of producing baseweb given the small
number of trial runs, and the uncertainty concerning the time
period for the contract given that Scapa had not yet issued its
Seller's Capacity Notice.  Regardless of these quibbles, it is
undisputed that Avery had some baseweb requirements for the three
years following the date the contract was signed, because Avery
continued to purchase solvent-coated baseweb during that period.
There is a dispute of material fact concerning whether Scapa was
able to produce baseweb meeting Avery's technical requirements,

specifically the maximum particle count specified in the contract.  If a jury finds that Scapa's baseweb met specifications, it could conclude that Scapa lost profits based on Avery's acknowledged need for baseweb as a component of Avloy® material.  Thus the Court cannot now conclude that Scapa's claim for lost profits must fail as a matter of law, and Avery's motion for summary judgment on this basis must be denied.

### 6.    Roll Number 17

Finally, Avery moves for summary judgment with respect to Scapa's claim for damages on roll number 17 from the November 2002 run because it asserts that Scapa admitted that that roll exceeded the maximum particle count.  Contrary to Avery's assertions, Meg Gilmartin of Scapa did not testify unambiguously that roll 17 exceeded specifications.[7]  Scapa obtained a particle count of 9 on this roll, Def. L.R. 56(a)1 Stmt., Ex. U at 2, while Avery obtained a particle count of 85.  Id., Ex. V at 2. The particle count on this roll, as the others, remains a disputed issue of material fact, and therefore Avery is not entitled to summary judgment on this theory or any other theory

---

[7]Gilmartin testified as follows:

Q.   Now other than roll 17, did anybody at Scapa ever get a defect
     count of over 17 for any of the other rolls?
A.   No.

Gilmartin Dep. at 86.  This exchange, while murky, does not constitute an admission that the particle count of roll 17 exceeded specifications, especially given the documentary evidence that Scapa obtained a particle count of 9 for this roll.

pertaining to Scapa's breach of contract claims.

**B.   Count One:  Declaratory and Injunctive Relief**

The first count of Scapa's complaint seeks a declaration that "(1) the Avloy Product it has supplied to [Avery] conforms to the requirements of the Agreement; (2) [Avery] is obligated to purchase Avloy Product solely from [Scapa] for a minimum period of three years following entry of the judicial decree; (3) [Scapa] is not contractually obligated to manufacture Avloy Product with features other than those set forth in the Agreement; (4) [Avery] is not entitled to terminate the Agreement or to act in a manner tantamount to terminating the Agreement; and (5) [Avery] is obligated to manufacture Avloy® solely by using Avloy Product supplied by [Scapa]," and Scapa also seeks corresponding injunctive relief.  Compl. ¶¶ 26-27.

The parties agree that this count stands or falls with Scapa's substantive breach of contract claims.  Because the Court has denied summary judgment to Avery on those counts, the Court also denies Avery's motion for summary judgment on Count One of Scapa's complaint.

**C.   Count Four: Breach of Implied Covenant of Good Faith and Fair Dealing**

Scapa asserts that Avery has breached the covenant of good faith and fair dealing implied in the parties' 2002 Agreement. Specifically, Scapa alleges that Avery "has claimed that the Avloy Product manufactured by [Scapa] must satisfy specifications

33

that are found nowhere within the Agreement. ... Upon information and belief, [Avery] is seeking to use its unreasonable interpretation of the Agreement's terms and requirements to justify the termination of the Agreement, or to justify [Avery] obtaining Avloy Product from a source other than [Scapa] and manufacturing Avloy® that does not incorporate [Scapa's] Avloy Product."  Compl. ¶¶ 38-39.

The Connecticut Supreme Court has set out the standards for a breach of good faith claim:

> It is axiomatic that the duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship.  In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.  The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term.
>
> To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.  Bad faith means more than mere negligence; it involves a dishonest purpose.

De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432-33, 849 A.2d 382, 387-88 (Conn. 2004) (internal citations, quotation marks and alterations omitted).

Scapa asserts that "Avery purposefully misinterpreted the 'particle' specification (a disputed material issue of fact) to avoid the requirements provisions of the Supply Agreement," which Avery belatedly realized would be unprofitable.  Pl. Brief in Opp. at 28.  Scapa argues that "Mr. Goldsmith [of Avery] signed a contract without consulting his technical staff."

The evidence, however, does not support Scapa's argument. Although one lower-level Avery quality control employee testified that she was "surprised at the particle count" of 17 contained in the contract, Giles Dep. at 33-34, Goldsmith stated that he consulted with high-level technical staff and knew Avery's customers would prefer lower particle counts and that the 17-particle specification might be unprofitable:

> ... I relied heavily on the technical advice given to me by Howard Enlow, Avery's then-Technical Director.  Mr. Enlow is more familiar with Avery's customers' technical requirements, including product specifications, than anyone else at Avery. Mr. Enlow agreed with my decision to accept the 17 particle defect count number, understanding that there would be some negative business ramifications, at least in the short term.

Second Goldsmith Aff. ¶ 9. Mr. Enlow's affidavit is ambiguous as to whether he believed the specification to be 3 or 17.[8]

---

[8]Enlow's affidavit states:

4.    Bill Goldsmith... consulted with me extensively with regard to the specifications contained in the April 30, 2002 Purchase and Supply Agreement between Avery and Scapa, including the specification that allowed for 3 'particles' 0.4 mm$^2$ or larger to be within a two linear foot sample of baseweb.

5.    We understood at the time we agreed to the 17 particle count specification that it would likely result in increased product returns from our customers ... .

Nonetheless, Scapa does not present evidence contradicting Goldsmith's statement that he consulted Enlow regarding the specifications.

Furthermore, Scapa presents no evidence that Avery belatedly concocted a new definition of "particle" to avoid paying for baseweb already manufactured or to avoid the three-year requirements period.  There is nothing in the record indicating that Avery intended to commit an "actual or constructive fraud" or acted with "a design to mislead or deceive ... ."  De La Concha, 269 Conn. at 433, 849 A.2d at 388.  Rather, the evidence shows nothing but a good-faith dispute over the correct interpretation of the term "particle" in the contract and whether the baseweb supplied by Scapa from the November 2002 run met the contractual specifications.  The evidence further shows that Avery and Scapa attempted to work out a compromise in the months following the production run, and that Avery did several particle counts on the disputed rolls in an effort to determine if it could use any of them.  Whether Avery's contractual interpretation is correct remains a disputed issue of material fact.  However, there is no evidence that Avery interpreted the contract in bad faith.  Therefore Avery is entitled to summary judgment on Count Four of Scapa's complaint.

**D.   Count Six:  Negligent Misrepresentation**

For the same reasons, Avery's motion for summary judgment

will be granted on Scapa's negligent misrepresentation claim.  In Count Six of its complaint, Scapa asserts that "[f]ollowing the execution of the Agreement, and at a time when [Avery] knew that [Scapa] was expending resources to manufacture Avloy Product, [Avery] negligently failed to inform [Scapa] that it had no intention of fulfilling its obligations under the Agreement." Compl. ¶ 49.  In support of this claim, Scapa's memorandum of law simply asserts that "Mr. Goldsmith could have saved [Scapa] much harm, during the seven months prior to execution of the Supply Agreement, [had] he used due diligence and had a frank discussion with his technical staff regarding the specifications he eventually sought to impose on [Scapa]."  Pl. Brief in Opp. at 26-27.

Scapa proffers no evidence that Avery knew or should have known from the beginning that it would likely abandon the contract.  Hence there is no evidence that Avery misrepresented its intentions to Scapa.  There is also no evidence that a miscommunication between Avery's managers and technical staff provided a motive to make misrepresentations, and Scapa's claim to the contrary is speculative.  Therefore Avery's motion for summary judgment will be granted on this count.

### E.   Count Five:  Promissory Estoppel

Count Five of Scapa's complaint asserts promissory estoppel, and Avery moves for summary judgment on the ground that "Scapa's

37

complaint does not further explain what promises, other than those set forth in the 2002 Agreement, Avery made."  Avery Brief at 16.

"Promissory estoppel is asserted when there is an absence of consideration to support a contract."  Glazer v. Dress Barn, Inc., 274 Conn. 33, 88, 873 A.2d 929, 963 (Conn. 2005).  Thus a court should "permit[] a jury to consider in the alternative claims for breach of contract and for promissory estoppel when there is an issue of whether the agreement may be too indefinite to allow for contract formation."  Id. at 88-89.

Scapa asserts that where there is an issue of fact concerning the coverage of the 2002 requirements contract--for example, whether the contract applies to 1-mil baseweb--Scapa should be able to present contractual and promissory estoppel theories to a jury in the alternative.  However, "[p]romissory estoppel ... is not a separate cause of action available to plaintiffs, but rather serves to allow enforcement of an otherwise validly formed contractual commitment that lacks traditional consideration."  Pavliscak v. Bridgeport Hosp., 48 Conn. App. 580, 592, 711 A.2d 747, 753 n.5 (Conn. App. 1998).  There is no assertion here that there was a failure of consideration when the parties signed the requirements contract in 2002.  Promissory estoppel is not a gap-filling measure for occasions when there is a dispute over the meaning of a contract.

38

A plaintiff "cannot use the theor[y] of promissory estoppel ... to add terms to [a] contract that are ... inconsistent with those expressly stated in it."  Wood v. Sempra Energy Trading Corp., No. 3:03CV986 (JCH), 2005 WL 465423 at * 11 (D. Conn. Feb. 22, 2005).

Thus defendant is correct that plaintiff's claim for promissory estoppel cannot be maintained where a valid contract supported by consideration is shown to exist.  Avery's motion for summary judgment on Count Five of Scapa's compliant therefore is granted.

**V.   CONCLUSION**

Accordingly, Avery's motion for summary judgment [Doc. # 28] is GRANTED IN PART as to Counts Four, Five and Six of Scapa's complaint as well as that portion of Counts Two and Three seeking damages related to 1-mil baseweb, and DENIED IN PART as to Count One and the remainder of Counts Two and Three.  Scapa's motion for summary judgment [Doc. # 31] is DENIED.


IT IS SO ORDERED.

/s/

_____

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 10th day of August, 2005.**

39